[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. HISTORY
The defendant stands before the court having been charged with the crimes of Robbery 1st degree, Connecticut General Statutes
§ 53a-134; Larceny 1st degree, Connecticut General Statutes
§ 53a-122; and Criminal Attempt to Commit Assault 1st degree,53a-49, 53a-59. The defendant was arrested on December 2, 1997 and was arraigned in the Superior Court at Derby, Geographical Area 5 on December 3, 1997. Subsequently the defendant posted bond and was released from custody and remains released from custody at this time.
The defendant, through counsel, in accordance with theConnecticut Practice Book, § 40-17, filed written notice with the prosecuting authority of his intent to rely upon the affirmative defense of mental disease or defect or extreme emotional disturbance at the time of the alleged crimes. Thereafter, in compliance with Connecticut Practice Book, § 40-18, the defendant, intending to rely upon expert testimony relating to the affirmative defense of mental disease or defect or extreme emotional disturbance or another condition bearing upon the issue of whether he had the mental state required for the offense charged, filed a copy in writing of his intent with the clerk. The defendant, through his counsel, also furnished the prosecuting authority with copies of reports of physical and/or mental examinations of the defendant prepared by experts whom the defendant intended to call as witnesses in connection with the offenses charged. This filing of the expert reports with the prosecuting authority was also in compliance with ConnecticutPractice Book, § 40-18.
The prosecuting authority upon receipt of the defendant's expert's reports had the defendant submit to a psychiatric examination by a psychiatrist designated for this purpose by the prosecuting authority. Upon receipt of this report by the CT Page 2526 prosecuting authority, a copy of the report was furnished to the defendant and his counsel.
The defendant, intending to rely upon the affirmative defense, of lack of capacity due to mental disease or defect pursuant toConnecticut General Statutes § 53a-13 has waived his right to a jury trial on February 10, 2000, and has elected to be tried by the Court. In relying upon Connecticut General Statutes § 53a-13, the defendant has pleaded "not guilty by reason of mental disease or defect" to all pending charges.
The defendant and the prosecuting authority have taken the unusual position of stipulating to all of the evidence, and have agreed that the police incident reports, the voluntary statements of the defendant dated December 2, 1997, and all medical treatment reports, including psychiatric reports are to be marked as full exhibits to be reviewed by the Court as the trier of fact. Other than these evidentiary exhibits, no witnesses will be called to present oral testimony before the Court. The parties have requested that the Court render its decision solely on the documentary evidence presented as exhibits 1-8 and exhibits 9A and 9B.
The Court trial commenced on February 10, 2000 at 2:00 P.M. The oral stipulations of the parties were submitted to the Court and the above referenced exhibits were received and marked. The court after a short recess to review the exhibits announced that it would need additional time to review the exhibits in order to render a decision. Thereafter, the Court adjourned the proceedings and scheduled the continuation of the trial to February 24, 2000.
II. PROCEDURAL STEPS AND STATUTORY REQUIREMENTS
Connecticut follows the majority rule, which is that insanity is an affirmative defense which casts upon the accused whom asserts it, the burden of establishing it by evidence sufficient to overcome the natural presumption of sanity. The defendant's burden of proof is by a fair preponderance of the evidence.
A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.Connecticut General Statutes, § 53a-13 (a) CT Page 2527
If a defendant wishes to interpose a defense of insanity at the time of the crime, he must file notice of intent to rely upon the defense of insanity. Connecticut Practice Book, § 40-17.
The initial burden of proof of showing insanity by way of mental disease or defect at the time of the commission of the crimes is upon the accused, by a preponderance of the evidence, but if the evidence adduced by either the accused or the State raises a doubt as to the sanity of the accused at the time of the commission of the crime, the accused is relieved of further proof on that issue and the burden of proof shifts to the State to establish the sanity of the accused beyond a reasonable doubt.
Therefore, once sufficient evidence on insanity has been produced to overcome the legal presumption of sanity, it is clear that the burden rests on the State, as it does in all other essential elements of the case, to prove beyond a reasonable doubt that the defendant was legally sane and responsible at the time the offenses were committed. State v. Hinckley,198 Conn. 77, 502 A.2d 388 (1985)
Connecticut General Statutes, § 53a-13 makes mental disease or defect an affirmative defense. The criminal defendant has the burden to prove by a preponderance of the evidence elements which constitute an affirmative defense, but which do not serve to negate any essential element of the crime which the State has the burden of proving beyond a reasonable doubt in order to convict.
The court is not compelled to accept the testimony of psychiatric experts as conclusive on the issue of the defendant's mental condition as it relates to his guilt of the crimes with which he is charged. Although a trial court may choose to attach special weight to the testimony of medical experts, the ultimate decision of mental illness is a legal decision.
Once sufficient evidence on insanity has been produced to overcome the legal presumption in favor of sanity, it is clear that the burden rests on the state, to prove beyond a reasonable doubt that the defendant was legally sane and responsible at the time the offenses were committed. State v. Hinckley, 198 Conn. 77
(1985).
In 1983, the legislative established insanity as an affirmative defense to a criminal accusation and defined the defense as being CT Page 2528 applicable to a defendant who, at the time he committed the proscribed act or acts "lacked substantial capacity, as a result of mental disease or defect, either to appreciate "the wrongfulness of his conduct or to control his conduct within the requirements of the law. Connecticut General Statutes § 53a-13
(a). Further, the legislature excluded from this defense such mental disease or defect if it was proximately caused by the voluntary use of intoxicating liquor or drugs, unless such drugs had been medically prescribed and used pursuant to said prescription. Connecticut General Statutes § 53a-13 (b).
When any person charged with an offense is found not guilty by reason of mental disease or defect, the court shall order such acquittee committed to the custody of the Commissioner of Mental Health for an examination to determine the acquittee's mental condition. Within forty-five (45) days of the order of commitment, the superintendent of the hospital for commitment shall file a report of the examination with the court and send a copy to the State's Attorney and the counsel for the acquittee.Connecticut General Statutes § 17a-582 (a)(b).
Within ten (10) days of receipt of the report, either the State's Attorney or counsel for the acquittee may file notice of intent to perform a separate examination. Any separate exam report shall be filed with the court within thirty (30) days of the filing with the court of the initial report. ConnecticutGeneral Statutes § 17a-582 (c).
The court shall conduct a hearing within fifteen (15) days of its receipt of any separate examination report, or if no separate examination was conducted, the court shall commence a hearing within twenty-five (25) days of the filing of the initial report.Connecticut General Statutes § 17a-582 (d)
At the hearing, where the acquittee shall have the burden of proving by a preponderance of the evidence that he should be discharged, Connecticut General Statutes § 17a-582 (f), the court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of the following orders:
 "(a) if the court finds that the acquittee is a person who should be confined or conditionally released, the court shall order the acquittee committed to the jurisdiction of the psychiatric review board CT Page 2529 and confined in a hospital for mental illness for custody, care and treatment pending a hearing before the board; provided that, the court shall fix a maximum term of commitment not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted; and if the court has reason to believe that the acquittee is a person who should be conditionally released, the court shall include in the order a recommendation that the acquittee be considered for conditional release; or
 (2) if the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody. Connecticut General Statutes § 17a-582 (e)
In determining whether an insanity acquittee should be confined to a mental hospital because his release from custody would constitute a danger to himself or to others, the court may property consider:
(1) the acquittee's present mental state or condition;
 (2) evidence of recent violent behavior, or attempted or threatened dangerous conduct;
 (3) the violent act for which he had been brought to trial; and
 (4) the fact that' while his symptoms were controllable by anti-psychotic drugs, if the acquittee were released and stopped taking the medication, he would revert back to an uncontrolled, psychotic state.
The determination of dangerousness constitutes a legal decision. The court's main concern must be the protection of society. The determination of dangerousness by the trial court reflects a societal rather than a medical judgment, and will require the court to balance the security interests of society against the rights and needs of the acquittee.
III. FINDINGS OF FACT
On December 2, 1997 at approximately 1:54 P.M., Christopher CT Page 2530 DeAngelo entered the First Union Bank, located at 654 New Haven Avenue, Derby, Connecticut. The defendant DeAngelo was armed with a pellet gun similar in appearance to a semi-automatic handgun. The defendant dressed in a disguise consisting of a fake mustache and beard, informed the assistant manager that she was to fill a brief case with money. He stated that he would not hurt her and that he would leave upon receiving the brief case filled with money. The assistant manager went to the bank safe, filled the brief case with $54,000.00 in United States currency and delivered it to the defendant. The defendant showed the pellet gun to the assistant manager and then left the bank.
Upon leaving the bank premises, the defendant began to enter his 1986 Chevrolet Camaro motor vehicle bearing registration number 511FBB. Despite police warnings to halt, the defendant entered his vehicle and began to drive away. The police pursued the defendant's vehicle. Despite additional police requests to halt, the defendant refused to do so. The police fired their weapons at the defendant's vehicle, striking it several times. During the course of the pursuit the defendant nearly struck a Derby Police Officer. The defendant was subsequently apprehended in the rear of the Service Merchandise parking lot. The pellet gun was found in the defendant's possession having been tucked into the waistband of his pants.
A subsequent search of the defendant's vehicle revealed a double barrel shotgun containing one live round in the chamber. The shotgun was located in the rear of the defendant's vehicle, on the floor behind the passengers seat. On the front passenger floor of the defendant's vehicle was a black briefcase containing United States currency. The fake beard and mustache were also removed from the defendant's person and were held as evidence by the Derby Police Department.
The defendant, having been taken into custody, was transported to the Derby Police Department and placed in a monitored prisoner cell. While in transit, the defendant wished to speak to the police officers. He was reminded again of his constitutional rights by the police officers who were transporting him to the Derby Police Department. On the date of the incident, December 2, 1997, at 5:07 p. m., the defendant acknowledged and signed a Notice of Rights form, verifying that he understood his constitutional rights, including his right to remain silent, and that any statements that the defendant may make could be used against the defendant. He was also advised of his right to CT Page 2531 consult with an attorney.
Subsequently, on December 2, 1997, the defendant gave the Derby Police Department a written voluntary statement regarding his participation in the events at the First Union Bank at approximately 1:54 p. m. on December 2, 1997.
In the voluntary written statement of the defendant dated December 2, 1997, the defendant admits that during the evening of December 1, 1997, he got the idea of robbing a bank. He then went to a store in Hamden, Connecticut and purchased the "phoney beard and mustache." A week prior to the incident of December 2, 1997, the defendant had purchased the pellet gun from a store in North Haven, Connecticut.
He arrived at the First Union Bank with the pellet gun in his waistband, under his coat. He was wearing the fake beard and mustache and was carrying the black briefcase. Subsequently, he met with the assistant manager at her desk where the defendant informed her that he would not hurt her and that she should not set off any bank alarms. The assistant manager took the empty briefcase, went to the safe and came back with the briefcase containing United States currency. The defendant took the pellet gun from his waistband and showed it to the assistant manager. He then got up and left, and walked outside.
Once outside, he was confronted by a "person" pointing a gun at him. This person ordered the defendant to "Stop. " The defendant continued walking to his car. As he started his car and began to drive away, the police fired their weapons, shattering the back window of "the defendant's auto. The defendant admits he was scared and attempted to flee from the police. Eventually, his auto was forced to stop near the Service Merchandise store.
The defendant was ordered to get out of his vehicle and to drop to the ground. The defendant complied with this order. He informed the police that the pellet gun was in his waistband. In his written statement of December 2, 1997, the defendant states "The reason they took me into custody is because I robbed the bank."
Subsequently, while in custody on December 2, 1997, the defendant gave a second voluntary statement, in writing, to the Wallingford Police regarding his involvement in a bank robbery at the Dime Savings Bank in Wallingford, Connecticut on November 26, CT Page 2532 1997 at approximately 3:30 p. m. He also included in that written voluntary statement facts regarding his involvement in a robbery at a K-Mart store in Wallingford, Connecticut on November 30, 1997 at 9:00 p. m. Additionally, he also admitted to his involvement in a robbery at a gas station on Center Street in Wallingford on November 30, 1997 following the K-Mart incident.
IV. MEDICAL/PSYCHIATRIC EVALUATIONS
In evaluating whether the defendant was suffering from a mental disease or defect at the time of the commission of the criminal offenses of December 2, 1997, the court has reviewed the following medical and psychiatric reports:
 1. Department of Corrections medical reports (State's Exhibit 4);
 2. Dr. Rossi's Psychiatric Evaluation of defendant dated July 8, 1997 (State's Exhibit 5);
 3. Cynthia D. Conrad, M.D., Ph.D. report dated December 30, 1998 (State's Exhibit 6);
 4. Psychiatric Report of Dr. Peter Breggin dated December 21, 1998 (State's Exhibit 7);
 5. Psychiatric Report of Robert C. Bransfield, dated August 24, 1998 (State's Exhibit 8);
 6. Psychiatric Report of Dr. Carl Salzman, Harvard Medical School, dated February 12, 1999 (State's Exhibit 9A);
 7. Psychiatric Report of Dr. Carl Salzman, Harvard Medical School, dated February 16, 1999 (State's Exhibit 9B).
On July 8, 1997, the defendant sought treatment with Dr. Lawrence Rossi for a condition diagnosed as Obsessive Compulsive Disorder. Dr. Rossi started the defendant on a course of pharmacotherapy with a Prozac dosage of 20 mg. On July 29, 1997, the benzodiazepine anxiolytic Xanax was added at 0.5 mg. BID was also prescribed. On August 6, 1997, the Prozac prescription was increased to 40 mg. And the Xanax was increased to 1 mg. BID. On September 2, 1997, the Xanax dosage was increased to 1 mg. TID, and on September 24, 1997, the Prozac dose was increased to 60 mg. Although the defendant's level of anxiety appeared to CT Page 2533 lessen, the obsessional thinking did not change to any great extent.
Prior to the incident on December 2, 1997, and other incidents mentioned in the voluntary statements of the defendant, the defendant last saw Dr. Rossi on November 22, 1997. No change in the defendant's medications were made at that time.
Subsequent to the defendant's arrest on December 2, 1997, the defendant next saw Dr. Rossi on March 24, 1998 and the Prozac dose was reduced to 20 mg., while the Xanax continued at 1 mg. TID. The previous Prozac dose of 60 mg. Had been continued while the defendant had been incarcerated, until this change of dosage on March 24, 1998. In mid-April, 1998, the defendant stopped taking Prozac, and by mid-June, 1998, the Xanax dosage was discontinued.
On August 24, 1998, the defendant was examined and evaluated by Robert C. Bransfield, M.D., a psychiatrist. Dr. Bransfield confirmed that the defendant had been suffering from Obsessive Compulsive Disorder on December 2, 1997. The prescription of Prozac caused the defendant "to become agitated and impulsive with an increasing degree of manic behavior." As the Prozac dosage was increased, the defendant's manic behavior became worse. The defendant's use of the Prozac in conjunction with Xanax and alcohol increased the defendant's impairment.
It is the opinion of Dr. Bransfield that the defendant's criminal behavior was caused by a combination of impairments from a previous case of Lyme Disease and an adverse drug reaction to the medication used to treat the Obsessive Compulsive Disorder. It is Dr. Bransfield's opinion that the defendant "did not appear to understand the difference between right and wrong at the time of the crimes."
Dr. Bransfield reports that 60 mg. of Prozac is a commonly prescribed dose to treat Obsessive Compulsive Disorder. He notes, however, that Prozac is an antidepressant, and that in an effort to achieve an anti-Obsessive Compulsive Disorder effect, "the antidepressant effect is excessive and causes manic like behavior with insomnia, impulsivity, and poor judgment." In Dr. Bransfield's opinion, the defendant's crimes "were not willful or knowing". The defendant was severely impaired at the time of the offenses. CT Page 2534
The defendant was next examined by Peter R. Breggin, M.D., a psychiatrist licensed to practice medicine in Virginia, Maryland, Washington, D.C. and the State of New York. Dr. Breggin is the director of the Center for the Study of Psychiatry and Psychology and a Faculty Associate in the Department of Counseling and Human Services of the Johns Hopkins University. He is the author of numerous books and professional articles dealing with adverse medication effects, including mental, behavioral and neurological abnormalities that can lead to criminal activity. Dr. Breggin evaluated the defendant and issued his report dated December 21, 1998.
Dr. Breggin reaches a conclusion that as a result of the voluntary ingestion of two psychiatric drugs, Xanax and Prozac which were prescribed for the defendant, and used in accordance with his physician's directions, that the defendant "suffered from a mental defect that caused him to lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform or control his conduct within the requirements of the law."
The conclusions are based on the fact that the defendant was taking Xanax and Prozac in large doses and both medications can produce drug-induced psychiatric disorders that constitute or create mental defect typical of that suffered by the defendant. One syndrome is disinhibition or paradoxical behavior. This is thoroughly documented in the literature in regard to Xanax, but can also be caused by Prozac. The other symptom is mania or manic-like behavior. This behavior is well documented in regard to both Prozac and Xanax, according to Dr. Breggin. "Both syndromes are characterized by lack of self-control, judgment, and insight." "Both can cause or include out-of-character, irrational, senseless, impulsive, bizarre and destructive behavior." "They can produce criminal actions that make no sense in terms of an individual's self-interest, and which are guaranteed to be discovered." The defendant's behavior, according to Dr. Breggin, was characteristic of these two behaviors of disinhibition and manic behaviors.
Mr. DeAngelo was taking Xanax and Prozac in combination. Either one was prescribed in sufficiently large doses to produce these syndromes. However, the combination of these drugs created an even greater risk because the drugs produce similar adverse reactions. CT Page 2535
In addition, the defendant began to abuse alcohol for the first time after he began to take his prescriptions for Prozac and Xanax. Both drugs commonly cause individuals to begin to abuse or worsen their abuse of alcohol. Alcohol in combination with Prozac and Xanax can severely worsen the adverse behavioral effects of all of the psychoactive substances. The defendant took his medication as prescribed, and he was never definitely or definitively told that he should not drink alcohol at all. "He was not warned, as far as can be ascertained, that Prozac and Xanax are a dangerous combination that can cause disinhibition, manic behavior and even psychosis."
Dr. Breggin concludes that if the defendant had not been prescribed Prozac and Xanax, "he would almost certainly never have committed these crimes."
At the request of the State's Attorney's Office for the Superior Court, Judicial District of Ansonia-Milford, the defendant was subsequently evaluated by Carl Salzman, M.D., Professor of Psychiatry at the Harvard Medical School. Dr. Salzman examined the defendant on February 10, 1999 and issued a report dated February 12, 1999 and a supplemental report dated February 16, 1999.
Dr. Salzman's conclusions include that the development of a manic syndrome in which judgment would be very impaired, and which would be characterized by impulsiveness, irritability and impaired social and interpersonal judgment is "highly consistent with giving 40 or 60 mg. of Prozac to a person with a strong family history of bipolar disorder." All antidepressants can cause this, including Prozac, although "one cannot say that Prozac is any more likely to cause it than any other antidepressant." Dr. Salzman states, "However., doses of 40 to 60 mg. used to treat Obsessive Compulsive Disorder are two to three times higher than the usual antidepressant dose, and are well known to cause mania in predisposed individuals."
Dr. Salzman's opinion to the best of his medical judgment is that the defendant's behavior at the time he committed the crimes is consistent with an episode of mania, probably of "psychotic proportions." The mania was the result of the high doses of Prozac, given to treat the defendant's Obsessive Compulsive Disorder.
V. SUMMARY
CT Page 2536
Section III of this Memorandum of Decision outlines theProcedural Steps and Statutory Requirements which the defendant, the prosecuting authority and the court must follow when considering whether a defendant can be adjudicated "Not Guilty" of the crimes charged by reason of mental disease or defect suffered by the defendant at the time of the commission of the charged criminal offenses. Connecticut General Statutes, 53a-13
(a)(b)(c).
As stated previously, the initial burden of proof of showing insanity by way of mental disease or defect at the time of the commission of the crimes is upon the accused defendant by a preponderance of the evidence. If the defendant sustains that burden of proof, the accused is relieved of further proof on that issue, and the burden shifts to the State of Connecticut, through the prosecuting authority, to establish the sanity of the defendant beyond a reasonable doubt. The State must prove that the defendant was legally sane and responsible at the time the offenses were committed.
The court has reviewed two psychiatric evaluations presented by the defendant and one psychiatric evaluation presented by the State. While the court, once again, is not compelled to accept the testimony of psychiatric experts as conclusive the issue of the defendant's mental condition at the time the crimes were committed, the court may choose to attach special weight to the testimony-reports of the medical experts.
The Court is aware that the decision of mental illness is a legal decision. However, the court, in this matter, when confronted with the unanimous opinions of the defendant's psychiatrists and the State's psychiatrist, also faces the situation where the defendant has established his affirmative defense by a preponderance of the evidence. The State due to the concurring opinion of its own expert psychiatrist, is unable to establish the defendant's sanity beyond a reasonable doubt. The State, thus, has not sustained its burden of proof.
Accordingly, the court finds that given the medical testimony that has been presented to the court as the trier of fact, only one conclusion can be reached. The judgment of the court is noted below.
VI. JUDGMENT/VERDICT
CT Page 2537
The defendant Christopher DeAngelo is found to be not guilty by reason that at the time he committed the criminal acts in Derby, Connecticut on December 2, 1997, said Christopher DeAngelo lacked substantial capacity, as a result of mental disease or defect. The defendant was unable to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. The court further finds that the defendant involuntarily ingested the prescription drugs Prozac and Xanax; that said drugs were prescribed for the defendant by the prescribing practitioner; and, that the medication were taken in accordance with the directions of said prescription.
The Court hereby orders the acquittee Christopher DeAngelo committed to the custody of the Commissioner of Mental Health for an examination to determine his mental condition pursuant toConnecticut General Statutes 17a-582 (a)(b)(c)(d)(e).
Furthermore, pursuant to Connecticut General Statutes Section17a-601 (a)(b) the court makes a finding that there are specific victims of the acts committed by the acquittee. The court finds the victims do desire notice of any hearing held by the court pursuant to Connecticut General Statutes 17a-582 or 17a-593.
A hearing to determine the mental condition of the acquittee will be held at a later date pursuant to Connecticut GeneralStatutes Section 17a-582 (b)(c)(d)(e).
THE COURT
ARNOLD, J.
 APPENDIX
A. Connecticut General Statutes
1. C.G.S. § 53a-13
2. C.G.S. § 17a-580
3. C.G.S. § 17a-581
4. C.G.S. § 17a-582
5. C.G.S. § 17a-583
CT Page 2538
6. C.G.S. § 17a-584
7. C.G.S. § 17a-601
Sec. 53a-13. Lack of capacity due to mental disease or defect as affirmative defense.
 (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.
 (b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a prescribing practitioner, as defined in subdivision (22) of section 20-571, and was used in accordance with the directions of such prescription.
 (c) As used in this section, the terms mental disease or defect do not include (1) an abnormality manifested only by repeated criminal or otherwise antisocial conduct or (2) pathological or compulsive gambling.
Sec. 17a-580. (Formerly Sec. 17-257a). Definitions.
As used in sections 17a-581 to 17a-602, inclusive, and this section
 (1) "Acquittee" means any person found not guilty by reason of mental disease or defect pursuant to section 53a-13;
 (2) "Board" means the Psychiatric Security Review Board established pursuant to section 17a-581;
 (3) "Conditional release" means release subject to the jurisdiction of the board for supervision and treatment on an outpatient basis and includes, but is not limited to, the monitoring of mental and physical health treatment; CT Page 2539
(4) "Court" means the Superior Court;
 (5) "Danger to himself or others" includes danger to the property of others;
 (6) "Hospital for mental illness" means any public or private hospital, retreat, institution, house or place in which a person with psychiatric disabilities or drug-dependent person is received or detained as a patient, but does not include any correctional institution of the state;
 (7) "Mental illness" includes any mental illness in a state of remission when the illness may, with reasonable medical probability, become active;
 (8) "Mental retardation" means mental retardation as defined in section 1-1g;
 (9) "Person who should be conditionally released" means an acquittee who has psychiatric disabilities or is mentally retarded to the extent that his final discharge would constitute a danger to himself or others but who can be adequately controlled with available supervision and treatment on conditional release;
 (10) "Person who should be confined" means an acquittee who has psychiatric disabilities or is mentally retarded to the extent that his discharge or conditional release would constitute a danger to himself or others and who cannot be adequately controlled with available supervision and treatment on conditional release;
 (11) "Person who should be discharged" means an acquittee who does not have psychiatric disabilities or is not mentally retarded to the extent that his discharge would constitute a danger to himself or others;
 (12) "Psychiatrist" means a physician specializing in psychiatry and licensed under the provisions of sections 20-9 to 20-12 inclusive;
 (13) "Psychologist" means a clinical psychologist licensed under the provisions of sections 20-186 to 20-195, inclusive; CT Page 2540
 (14) "State's attorney" means the state's attorney for the judicial district wherein the acquittee was found not guilty by reason of mental disease or defect pursuant to section 53a-13;
 (15) "Superintendent" means any person, body of persons or corporation, or the designee of any such person, body of persons or corporation, which has the immediate supervision, management and control of a hospital for mental illness and the patients therein.
Sec. 17a-581. (Formerly Sec. 17-257b). Psychiatric Security Review Board. Membership. Meetings. Regulations.
 (a) There is hereby established a Psychiatric Security Review Board which shall be an autonomous body within the Department of Mental Health and Addiction Services for administrative purposes only. The board shall consist of six members who shall serve for a term of four years and shall be appointed by the Governor with the advice and consent of either house of the General Assembly, except that of the members first appointed to the board: (1) One shall serve for a term ending June 30, 1987; (2) two shall serve for terms ending June 30, 1988; (3) two shall serve for terms ending June 30, 1989; and (4) one appointed pursuant to subdivision (6) of subsection (b) of this section shall serve for a term ending June 30, 1999.
 (b) The membership shall be composed of: (1) A psychiatrist experienced with the criminal justice system and not otherwise employed on a permanent basis by the state; (2) a psychologist experienced with the criminal justice system and not otherwise employed on a permanent basis by the state; (3) a person with substantial experience in the process of probation; (4) a member of the general public; (5) an attorney who is a member of the bar of this state; and (6) a member of the general public with substantial experience in victim advocacy.
 (c) No employee of the Division of Criminal Justice or the Public Defender Services Commission shall be a member of the board.
 (d) The Governor at any time may remove any member for inefficiency, neglect of duty or malfeasance in office. CT Page 2541
 (e) A member of the board not otherwise employed full-time by the state shall be paid seventy-five dollars for each day during which the member is engaged in the performance of official duties. In addition, subject to sections 4-15 and 5-141c regulating travel and other expenses of state officers and employees, the member shall be reimbursed for actual and necessary travel and other expenses incurred in the performance of official duties.
 (f) Subject to any applicable provision of sections 5-193 to 5-268, inclusive, the board may hire employees to assist in the performance of its duties under sections 17a-580 to 17a-602, inclusive.
 (g) A majority of the members of the board constitutes a quorum for the transaction of business. Hearings shall be held before members of the board.
 (h) The board shall meet at least twice every month, unless the chairman determines that there is not sufficient business before the board to warrant a meeting at the scheduled time. The board shall also meet at other times and places specified by the call of the chairman or of a majority of the members of the board.
 (i) No member of the board shall be personally liable for damage or injury caused in the discharge of his duties. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of chapter 53.
 (j) The board may adopt in accordance with chapter 54 such regulations as may be necessary to carry out the purposes of sections 17a-580 to 17a-602, inclusive.
Sec. 17a-582. (Formerly Sec. 17-257c). Confinement of acquittee for examination. Court order of commitment to board or discharge.
 (a) When any person charged with an offense is found not guilty by reason of mental disease or defect pursuant to section 53a-13, the court shall order such acquittee committed to the custody of the Commissioner of Mental Health and Addiction Services who shall cause such acquittee to be confined, pending an order of the court pursuant to CT Page 2542 subsection (e) of this section, in any of the state hospitals for psychiatric disabilities or to the custody of the Commissioner of Mental Retardation, for an examination to determine his mental condition.
 (b) Within forty-five days of the order of commitment pursuant to subsection (a) of this section, the superintendent of such hospital or the Commissioner of Mental Retardation shall cause the acquittee to be examined and file a report of the examination with the court, and shall send a copy thereof to the state's attorney and counsel for the acquittee, setting forth the superintendent's or said commissioner's findings and conclusions as to whether the acquittee is a person who should be discharged.
 (c) Within ten days of receipt of such superintendent's or said commissioner's report, either the state's attorney or counsel for the acquittee may file notice of intent to perform a separate examination of the acquittee. An examination conducted on behalf of the acquittee may be performed by a psychiatrist or psychologist chosen by the acquittee and shall be performed at the acquittee's expense unless he is indigent. If the acquittee is indigent, the court shall provide him with the services of a psychiatrist or psychologist to perform the examination at the expense of the state. The superintendent or said commissioner who conducted the initial examination shall, within five days of a request of any party conducting a separate examination pursuant to this subsection, release to such party all records and reports compiled in the initial examination of the acquittee. Any separate examination report shall be filed with the court within thirty days of the filing with the court of the initial examination report by the superintendent or said commissioner
 (d) The court shall commence a hearing within fifteen days of its receipt of any separate examination report or if no notice of intent to perform a separate examination has been filed under subsection (c) of this section, within twenty-five days of the filing of such initial examination report.
 (e) At the hearing, the court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of CT Page 2543 the following orders:
 (1) If the court finds that the acquittee is a person who should be confined or conditionally released, the court shall order the acquittee committed to the jurisdiction of the board and either confined in a hospital for psychiatric disabilities or placed with the Commissioner of Mental Retardation, for custody, care and treatment pending a hearing before the board pursuant to section 17a-583; provided (A) the court shall fix a maximum term of commitment, not to exceed the maximum sentence that could have been imposed if the acquittee had been convicted of the offense, and (B) if there is reason to believe that the acquittee is a person who should be conditionally released, the court shall include in the order a recommendation to the board that the acquittee be considered for conditional release pursuant to subdivision (2) of section 17a-584; or
 (2) If the court finds that the acquittee is a person who should be discharged, the court shall order the acquittee discharged from custody.
 (f) At the hearing before the court, the acquittee shall have the burden of proving by a preponderance of the evidence that he is a person who should be discharged.
 (g) An order of the court pursuant to subsection (e) of this section may be appealed by the acquittee or the state's attorney to the Appellate Court. The court shall so notify the acquittee.
 (h) During any term of commitment to the board, the acquittee shall remain under the jurisdiction of the board until discharged by the court pursuant to section 17a-593. Except as provided in subsection (c) of said section, the acquittee shall be immediately discharged at the expiration of the maximum term of commitment.
 (i) On committing an acquittee to the jurisdiction of the board, the court shall advise the acquittee of the right to a hearing before the board in accordance with section 17a-583.
Sec. 17a-583. (Formerly Sec. 17-257d). Initial hearing by board after commitment. CT Page 2544
 (a) The board shall conduct a hearing to review the status of the acquittee within ninety days of an order committing the acquittee to the jurisdiction of the board, provided, if the court has recommended consideration of conditional release, the board shall, absent good cause shown, conduct a hearing to review the status of the acquittee at its next regularly scheduled meeting.
 (b) At any hearing held pursuant to this section, the board shall make a finding and act pursuant to section 17a-584.
Sec. 17a-584. (Formerly Sec. 17-257e). Finding and action by board. Recommendation of discharge. Order of conditional release or confinement.
 At any hearing before the board considering the discharge, conditional release or confinement of the acquittee, except a hearing pursuant to section 17a-592 or subsection (d) of section 17a-593, the board shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, shall do one of the following:
 (1) If the board finds that the acquittee is a person who should be discharged, it shall recommend such discharge to the court pursuant to section 17a-593.
 (2) If the board finds that the acquittee is a person who should be conditionally released, the board shall order the acquittee conditionally released subject to such conditions as are necessary to prevent the acquittee from constituting a danger to himself or others.
 (3) If the board finds that the acquittee is a person who should be confined, the board shall order the person confined in a hospital for psychiatric disabilities or placed with the Commissioner of Mental Retardation for custody, care and treatment.
Sec. 17a-584. (Formerly Sec. 17-257e). Finding and action by board. Recommendation of discharge. Order of conditional release or confinement.
At any hearing before the board considering the discharge, CT Page 2545 conditional release or confinement of the acquittee, except a hearing pursuant to section 17a-592 or subsection (d) of section 17a-593, the board shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, shall do one of the following:
 (1) If the board finds that the acquittee is a person who should be discharged, it shall recommend such discharge to the court pursuant to section 17a-593.
 (2) If the board finds that the acquittee is a person who should be conditionally released, the board shall order the acquittee conditionally released subject to such conditions as are necessary to prevent the acquittee from constituting a danger to himself or others.
 (3) If the board finds that the acquittee is a person who should be confined, the board shall order the person confined in a hospital for psychiatric disabilities or placed with the Commissioner of Mental Retardation for custody, care and treatment.
Sec. 17a-601. (Formerly Sec. 17-257v). Notice to victims of court and board hearings.
 (a) For the purposes of this section, "victim" means a person who is a victim of a class A, B or C felony, the legal representative of such person or a member of a deceased victim's immediate family.
 (b) Any court rendering a judgment of acquittal pursuant to section 53a-13 shall make a specific finding as to whether there is a victim of the act committed by the acquittee and, if so, whether the victim desires notice pursuant to this section. If the court finds that a victim desires notice, it shall notify the victim of any hearing held by the court pursuant to section 17a-582 or 17a-593. The court shall, on committing an acquittee to the jurisdiction of the board, identify the victim to the board and the board shall thereafter make a reasonable effort to notify the victim of any board hearings or orders or of any escape of the acquittee. The victim may appear at any court or board hearing concerning the acquittee to make a statement.
CT Page 2546